AO 106 (Rev. 04/10) Application for a Search Warrant

FILED
VANESSA L. ARMSTRONG, CLERK

JUN 1 1 2019

U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

## UNITED STATES DISTRICT COURT
### for the
### WESTERN DISTRICT OF KENTUCKY

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA FOR
SEARCH AND SEIZURE WARRANT FOR
1.    SAMSUNG GALAXY S8+ SM-G955U,
       IMEI 355989084777502,
2.    WHITE NEMA THUMBDRIVE,
3.    SILVER SEAGATE BACKUP HARDDRIVE
       SN: NA958ZHD
4.    BLACK HUAWEI TABLET MODEL GB2-W09
ALL CURRENTLY LOCATED AT THE
FEDERAL BUREAU OF INVESTIGATION,
12401 SYCAMORE STATION PLACE,
LOUISVILLE, KENTUCKY 40299

3:19 mj- 453-HBB

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (*identify the person or describe property to be searched and give its location*): SEE ATTACHMENT A.
*1.    SAMSUNG GALAXY S8+ SM-G955U,*
*       IMEI 355989084777502,*
*2.    WHITE NEMA THUMBDRIVE,*
*3.    SILVER SEAGATE BACKUP HARDDRIVE*
*       SN: NA958ZHD*
*4.    BLACK HUAWEI TABLET MODEL GB2-W09*
*ALL CURRENTLY LOCATED AT THE FEDERAL BUREAU OF INVESTIGATION, 12401 SYCAMORE STATION PLACE, LOUISVILLE, KENTUCKY 40299*

located in the Western District of Kentucky, there is now concealed (*identify the person or describe the property to be seized*): ATTACHMENT B.

The basis for the search under Fed. R. Crim P. 41(c) is (*check one or more*):

☑    evidence of a crime;

☑    contraband, fruits of a crime, or other items illegally possessed;

☑    property designed for use, intended for use, or used in committing a crime;

☐    a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Offense Description | Code Section |
|---|---|
| *Interstate Threatening Communications -* | *Title 18, United States Code, Sections 875(a) and (c);* |
| *Kidnapping -* | *Title 18, United States Code, Section 1201;* |
| *Ransom Money -* | *Title 18, United States Code, Section 1202;* |
| *Selling or Buying of Children —* | *Title 18, United States Code, Section 2251A;* |
| *Bank Fraud -* | *Title 18, United States Code, Section 1344; and* |
| *Aggravated Identity Theft -* | *Title 18, United States Code, Section 1028A.* |
| *Sex Trafficking of Children by Force, Fraud, or Coercion—* | *Title 18, United States Code, Section 1591(a)(1);* |
| *Transportation of Minors –* | *Title 18, United States Code, Section 2423(a) and (e);* |
| *Sexual Exploitation of Children (Production of Child Pornography)—* | *Title 18, United States Code, Section 2251(a); and* |
| *Possession of Child Pornography—* | *Title 18, United States Code, Section 2252A(a)(5)(B).* |

The application is based on these facts:

**FILED**

VANESSA L. ARMSTRONG, CLERK

JUN 1 1 2019

U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

3:19 mj-453-HBB

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE

AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

SAMSUNG GALAXY S8+ SM-G955U, IMEI 355989084777502, WHITE NEMA

THUMBDRIVE, SILVER SEAGATE BACKUP HARD DRIVE SN: NA958ZHD, and

BLACK HUAWEI TABLET MODEL GB2-W09 all currently located at the Federal

Bureau of Investigation, 12401 Sycamore Station Place, Louisville, Kentucky 40299

I, Andrew Phillips having been duly sworn, state;

Identity of Law Enforcement Officer Making Request

1. I, Andrew Phillips, being duly sworn, do hereby state the following.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI) assigned to the Louisville Field Office. I have been a Special Agent of the FBI since July 2003. I have been involved in the investigation of numerous types of offenses against the United States, including Financial Institution Fraud, Mortgage Fraud, Tax Fraud, Immigration Fraud, and the illegal structuring of financial transactions and the use of these financial transactions to promote fund raising or to lawfully engage in monetary transactions involving the proceeds of specified and unlawful activity, commonly referred to collectively as Money Laundering. I have also conducted investigations into violations of the Controlled Substances Act.

3. In the course of conducting and participating in criminal investigations, I have been involved in interviewing and debriefing informants; interviewing witnesses; interviewing victims; conducting physical surveillance; consensually monitoring and

recording conversations; and preparing and executing search and arrest warrants.

4.  My knowledge of the facts and circumstances contained within this affidavit is based on my personal investigation, as well as reports made to me by other law enforcement agencies, including local city, county, and state law enforcement, information obtained from other non-governmental institutions and businesses located in Kentucky and elsewhere, and various other reports obtained during my investigation. The statements contained in this affidavit are based either on my personal knowledge or information obtained from other law enforcement officers, cooperating witnesses, victims, and information obtained by way of legal process. This affidavit does not set forth every fact discerned throughout the investigation; rather, it contains a summary of the investigation to date and sets forth only those facts that I believe necessary to establish probable cause to search the items described.

5.  The information contained throughout this affidavit is either known personally by me or other federal agents and task force officers of the FBI Louisville Field Office. The information contained herein is supported by my training, experience, and participation in this and other investigations, including receipt of information from reliable sources and review of documentation and records as more particularly described herein. I have set forth the facts that I believe are necessary to establish probable cause to conduct a search of the Samsung Galaxy S8+ model number SM-G955U, IMEI 355989084777502, telephone number 915-241-7423, a white Nema thumbdrive, a silver Seagate backup hard drive with serial number NA958ZHD, and a black Huawei tablet model GB2-W09, all currently located at the Federal Bureau of Investigation, 12401 Sycamore Station Place, Louisville, Kentucky 40299.

<u>Offense Being Committed</u>

6.  Bryan Conley (CONLEY) is suspected of conducting the following offenses:

   a.  Interstate Threatening Communications - Title 18, United States Code, Sections 875(a) and (c);
   b.  Kidnapping - Title 18, United States Code, Section 1201;
   c.  Ransom Money - Title 18, United States Code, Section 1202;
   d.  Selling or Buying of Children -- Title 18, United States Code, Section 2251A;
   e.  Bank Fraud - Title 18, United States Code, Section 1344; and
   f.  Aggravated Identity Theft - Title 18, United States Code, Section 1028A.
   g.  Sex Trafficking of Children by Force, Fraud, or Coercion---Title 18, United States Code, Section 1591(a)(1);
   h.  Transportation of Minors -- Title 18, United States Code, Section 2423(a) and (e);
   i.  Sexual Exploitation of Children (Production of Child Pornography)---Title 18, United States Code, Section 2251(a); and
   j.  Possession of Child Pornography---Title 18, United States Code, Section 2252A(a)(5)(B).

<u>Probable Cause – Interstate Threatening Communications, Kidnapping, Ransom Money, and Selling or Buying of Children</u>

7.  On 29 January 2019 at approximately 10:00 AM CST, R.W. left her residence located at █████████████████ TN. R.W. was believed to have left in her 2013 Toyota Prius.

8.  On 29 January 2019 at approximately 1:45 PM CST, the Brentwood Police Department (BPD), located in Brentwood, Tennessee, received a call from M.W., who reported her daughter, R.W. had been kidnapped. Prior to calling BPD, M.W. received iMessages on her phone (615-838-4651) from R.W.'s phone number (615-636-5512).

9.  CONLEY, using R.W.'s cellular telephone, claimed to have R.W., and subsequent messages directed M.W. to pay a ransom of $20,000 to ensure R.W.'s release. CONLEY told M.W. and another family member to start driving towards Toledo, OH,

3

where M.W. would receive another call from CONLEY.

10. The following are examples of iMessages from 615-636-5512 to 615-838-4651:

    a.  615-636-5512:    Pack everything you have worth value and head towards ███

    b.  615-636-5512:    One cop or police report she's done. Goal is close to 20,000 as you can

    c.  615-636-5512:    She will be missing fingers and toes if you don't hurry le fuck up

    d.  615-636-5512:    Ok I'm going to start removing toes if not answer

    e.  615-636-5512:    You have ten minutes to be on road or I sell her ass

    f.  615-636-5512:    One more lie she's dead

    g.  615-636-5512:    If you argue again I'll message in 3 hours after she's been raped a lot

    h.  615-636-5512:    She will be raped every hour aft

    i.  615-636-5512:    In 1 hour they will start rapeing her ass

    j.  615-636-5512:    You listen or I send you pic of her body

    k.  615-636-5512:    Go to mall and wait for me to get money confirmed

11. CONLEY told M.W. that R.W. was being held at a residence in Toledo, OH, but later changed the location to Cincinnati, OH. CONLEY refused to allow M.W. to talk with R.W., but sent M.W. a proof of life photograph at approximately 6:42 PM CST. The proof of life photograph depicted R.W. inside an unknown vehicle with what appeared to be binding material around her mouth.

4

12. The ransom was ultimately negotiated down to $400 and jewelry. CONLEY and the family of R.W. agreed the father of R.W. would start travelling towards Toledo, OH, to drop off the newly negotiated ransom.

13. BPD reviewed the proof of life photograph and determined that the interior of the vehicle was consistent with a 2013-2018 Ford Taurus SE.

14. At approximately 8:54 AM on 29 January 2019, an unidentified user attempted to log in to R.W.'s USAA bank account. The individual provided R.W.'s correct social security number but failed to correctly answer any of the security questions. At 11:31 AM there was a successful login to R.W.'s USAA bank account using R.W.'s telephone number.

15. USAA provided that the telephone number associated with the first attempted login which was 915-241-7423. An exigent request to Sprint Corporation revealed, 915-241-7423 was registered to CONLEY's wife at █████████████████████████37042.

16. An NCIC query revealed Cynthia Conley had a gray 2014 Ford Taurus registered to her at █████████████████37042. Open source searches revealed Cynthia Conley and CONLEY both had resided at ████████████████37042.

17. On January 29, 2019 at approximately 12:02 AM CST, a witness at Walmart in Oak Grove, KY, advised a white male attempted to use R.W.'s credit card. After having the credit card denied, the unidentified white male left in a grey Ford Taurus. A review of surveillance video by law enforcement confirmed that a white male left in a grey Ford Taurus.

18. During the initial iMessages messages between CONLEY and M.W., CONLEY offered as proof he had R.W. by providing an address where R.W.'s Toyota Prius was left.

5

CONLEY told M.W. the Toyota Prius was parked at ███████████████
████████████. On January 30, 2019, R. W.'s Toyota Prius was located at the Kroger located at 185 Adam Shephard Parkway, Shepherdsville, KY.

19. Emergency ping orders were obtained for CONLEY's wife and R.W.'s cellular telephones. Using the emergency ping order, it was revealed that CONLEY's wife's telephone and R.W.'s telephones were in close proximity throughout the duration of the pings.

20. At approximately 2:25 PM CST on 30 January 2019, while FBI Special Agents were located with the father of R.W., in the state of Tennessee, the father received a message from the phone of R.W. with the following text, "One more lie she's dead". Location information provided by the cellular carrier, Verizon Wireless, placed R.W.'s phone at the following coordinates in the state of Kentucky at 2:25 PM CST on 30 January 2019: 36.96229889 LAT/-87.454605 LONG. These coordinates plot in vicinity of Hopkinsville, Kentucky.

21. On 30 January 2019, at approximately 3:30 PM CST, the ransom payment was delivered to the Flying J Travel Center, located at 18750 Herndon Oak Grove Road, Oak Grove, KY 42262.

22. On 30 January 2019 at approximately 5:30 PM CST, FBI Louisville Division observed CONLEY retrieve the ransom payment from behind a dumpster at the Flying J Travel Center in Oak Grove, KY. CONLEY got into a Ford Taurus and left the Flying J Travel Center.

23. FBI Louisville Division followed CONLEY in the 2014 Ford Taurus to a Marathon Gas Station located at 802 South Main Street, Leitchfield, KY 42754. CONLEY was arrested at the Marathon Gas Station. Subsequent to the arrest of CONLEY, a search was performed. During the search of CONLEY's person, an Apple iPhone A1864, S/N DX3XH0XEJCLP, was found. CONLEY repeatedly asked FBI personnel to retrieve his telephone, a Samsung Galaxy S8+ SM-G955U, IMEI 355989084777502, from the center console of the Ford Taurus.

24. Subsequent to the arrest of CONLEY, R.W. was found in the rear passenger seat of Ford Taurus driven by CONLEY.

25. The Ford Taurus, VIN 1FAHP2D89EG147917 and contents therein; the Apple iPhone A1864, S/N DX3XH0XEJCLP; and the Samsung Galaxy S8+ SM-G955U, IMEI 355989084777502 were all seized and transported FBI Headquarters, located at 12401 Sycamore Station Place, Louisville, KY 40299 for storage.

26. Review of information related to the location of Apple servers indicates that there are no Apple servers located in Kentucky or Tennessee. Consultation with individuals familiar with Apple's iMessaging service reveals that iMessages travel from the sender's Devices, in this case R.W.'s iPhone, to the receiver's Devices, in this case M.W.'s iPhone, by way of Apple servers. iMesssages sent from R.W.'s iPhone with telephone number 615-636-5512 to M.W.'s iPhone with telephone number 615-838-4651, between 29 January 2019 through 30 January 2019, traversed through Apple servers located outside of Kentucky, Tennessee, and Ohio.

**Interview of R.W. on 30 January 2019**

27. On 30 January 2019, the FBI conducted an interview of R.W. R.W. advised she met a person named "Lance" on the dating service "PlentyofFish". R.W. matched with "Lance" and began communicating with "Lance" about modeling. R.W. was told by "Lance" that "Lance's" agent, CONLEY, could assist R.W. with a modeling career. "Lance" asked to meet R.W. in Dover, TN on 26 January 2019, but R.W. was told to meet CONLEY at McDonalds to drive to the location chosen by "Lance".

28. During the course of meetings with CONLEY, R.W. and CONLEY discussed the modeling industry and CONLEY told R.W. that he was an undercover police officer. CONLEY further advised R.W. that "Lance" was also a police officer and they both discovered a plot that involved R.W. being targeted on PlentyOfFish to be kidnapped and sold into a sex trafficking ring.

29. On 27 January 2019, R.W. and CONLEY met at a hotel in Brentwood, TN where R.W. and CONLEY had consensual sexual intercourse. While at the hotel, CONLEY took nude photographs of R.W. R.W. was also gagged in a photograph taken by CONLEY. R.W. believed that the photographs were all related to being a model.

30. On 29 January 2019, at approximately 1:00 PM or 2:00 PM, R.W. met with CONLEY at a Kroger near Louisville, KY. R.W. left her car, a Toyota Prius, in the parking lot of Kroger and got into a car with CONLEY.

31. After arriving at a location with CONLEY, R.W. was bound and blindfolded for a photography shoot. R.W. said she continued to believe the bondage photographs were taken in relation to modeling. The bondage photographs were taken inside of CONLEY's car. Shortly after entering CONLEY's car, CONLEY took R.W.'s telephone and she was not allowed to use it.

32. After being bound and photographed, R.W. was convinced to remain out of sight of the public. R.W. was bound with a rope for several hours and covered with a blanket. R.W. was told that the police needed photographs of her bound. R.W. recalled seeing an Elizabethtown sign while being driven around. R.W. was unbound after reaching Elizabethtown. R.W. and CONLEY slept in CONLEY's car the night of 29 January 2019. R.W. was led to believe she was still in danger of being targeted by the sex trafficking ring and CONLEY was waiting to hear from CONLEY's Chief of Police. R.W. advised she was encouraged into having sexual intercourse again with CONLEY.

33. When stopping to retrieve the ransom money, CONLEY told R.W. that he was stopping to retrieve R.W.'s wallet. R.W. advised she did not know CONLEY was retrieving ransom money. R.W. further advised she was unaware of the ransom demands made to her family.

34. FBI asked if R.W. had met or spoken to "Lance" in person. She said she had only ever texted him with her phone. She said the messages were green meaning that the messages were not sent to an iPhone but to another type of phone.

### Interview of Conley on 30 January 2019

35. On 30 January 2019, CONLEY was interviewed by the FBI. CONLEY advised he met R.W. through his friend "Lance". CONLEY met "Lance" approximately one year ago while living in Clarksville, TN. CONLEY stated "Lance" was a police officer.

36. On 28 January 2019, R.W. and "Lance" were supposed to meet at Land Between the Lakes (LBL), but R.W. did not know how to find the meet location, therefore CONLEY agreed to help R.W. get to the meet location. CONLEY stated that "Lance"

9

did not make it to the meet location during his first time with R.W. R.W. and CONLEY exchanged numbers and began communicating.

37. On 29 January 2019, R.W. and "Lance" were supposed to meet again, but "Lance" was arrested. R.W. met CONLEY at a Kroger in Shepherdsville, KY. CONLEY and R.W. stayed together in a hotel near Bowling Green, KY. After waking in the morning, on 30 January 2019, CONLEY and R.W. drove around talking. CONLEY drove R.W. back to the Land Between the Lakes area where they hung out. CONLEY received a call from "Lance" while at Land Between the Lakes. "Lance" told CONLEY that he was not going to meet R.W., therefore CONLEY could take R.W. home. "Lance" asked CONLEY to pick up a bag for him at the Flying J on exit 41A. CONLEY stated that "Lance" told CONLEY to remove cash from the bag and give some of the cash to R.W. CONLEY gave R.W. $20 from the bag.  CONLEY did not provide a last name of "Lance".

38. CONLEY stated that "Lance" informed him of a plot where R.W. may be kidnapped. CONLEY was told to drive R.W. around because of the possible danger.

39. CONLEY stated that he and R.W. had consensual sexual intercourse during their time together. R.W. stayed in the back seat of CONLEY's car during her entire stay with CONLEY.

40. CONLEY stated "Lance" had "freelancing" photography shoots that R.W. could do to earn money. CONLEY took photographs of R.W. bound and gagged as part of the "freelancing" photography shoots. CONLEY also stated that R.W. consented to CONLEY taking nude photographs of her. CONLEY stated that he only had possession of R.W.'s telephone when CONLEY took pictures of R.W.

10

41. CONLEY stated that he accidently used R.W.'s credit card when seen on surveillance footage at Walmart on 29 January 2019.

### Arrest of Conley on 30 January 2019

42. When CONLEY was arrested by the FBI on 30 January 2019, agents retrieved $344.66 in cash from his person. Included in the $344.66 were (17) $20.00 bills. Prior to the loading and placement of the ransom bag, agents made a record of the serial numbers of the currency placed inside. Affiant compared the serial numbers previously recorded to the (17) $20.00 bills taken from CONLEY's person. A total of (15) of the $20.00 bills were exact matches between the currency loaded into the ransom bag and the currency taken from CONLEY's person. The other two $20.00 bills were a suspected match as the last digit of the serial number on the currency loaded into the ransom bag could not be clearly seen.

43. While CONLEY was being booked at the FBI office in Louisville, KY, early in the morning of 31 January 2019, he spontaneously stated in the presence of the agents "this is what I get for helping out a buddy", indicating towards his handcuffs.

### Interview of R.W. on 13 February 2019

44. On 13 February 2019, R.W. was interviewed again by the FBI about her interaction with CONLEY between 26 January 2019 and 30 January 2019. R.W. advised that the "Lance" profile on Plenty of Fish stated that "Lance" was living in the Nashville area and having a famous family name. R.W. explained that the photo of "Lance" showed a clean shaven, white male, who was "good looking". R.W. has only communicated with

11

"Lance" via messages sent over the Plenty of Fish application and through text messages on her phone. R.W. advised the first time she communicated with "Lance" was on 26 January 2019. R.W. has logged onto Plenty of Fish since the kidnapping but the "Lance" profile has been deleted.

45. R.W. stated that while talking to CONLEY, he told her that he was interested in assisting her in developing a modeling portfolio and that individuals could make money in the modeling business. CONLEY advised that modeling jobs including sexual content and/or nudity paid more, up to thousands of dollars. After meeting CONLEY on 26 January 2019 at the Land Between the Lakes area, R.W. got into the back seat of CONLEY's vehicle and he took photos of her on his cell phone, including sexually suggestive photos. Afterwards, R.W. returned home.

46. The next day, 27 January 2019, R.W. continued to communicate with CONLEY. CONLEY told R.W. that "Lance's" last name was Debeer or DeBeir. R.W. also sent CONLEY a photo of a coworker, "Missy", as "Missy" wanted to become involved in modeling with CONLEY as well. Later on 27 January 2019, CONLEY invited R.W. to the Extended Stay hotel where they discussed modeling and a modeling contract. While at the hotel, CONLEY took R.W.'s personal information to include her date of birth, address, phone numbers, and other personal details for the modeling contract.

47. CONLEY convinced R.W. to have sex with him that night for the purpose of developing her modeling portfolio. CONLEY also had R.W. drink an unknown substance from a red Yeti container. Afterwards, R.W. returned home.

48. On 28 January 2019, "Lance" contacted R.W. and asked to meet her at the Land Between the Lakes, with CONLEY being available to drive her to the location. R.W.

12

advised that again "Lance" was a "no show". During this meeting with CONLEY, R.W. advised she had placed her purse and backpack in his vehicle. Inside her backpack was her wallet, which contained various personal cards, including her USAA credit card, USAA debit card, social security card, and other affects. CONLEY advised R.W. that "Lance" had been arrested for a second time and could not make the meeting, so R.W. drove home, however R.W. forget to retrieve her purse and backpack from CONLEY's vehicle. While driving home, R.W. contacted CONLEY about her purse and backpack she left in his vehicle. CONLEY stated he had her purse and backpack and that she could come to a hotel near Fort Campbell to retrieve them. R.W. went home instead.

49. R.W. advised that on 29 January 2019, she had received a fraud alert from USAA regarding her USAA bank account. R.W. logged in to check on her account. R.W. advised she never gave CONLEY permission to use her identity or credit/bank cards. R.W. remembers that the alert stated there were two unauthorized transactions from Walmart and/or Mapco.

50. On 29 January 2019, CONLEY contacted R.W. advising there was a photo shoot in Kentucky and he instructed her to start driving towards Louisville. R.W. ran out of gas along the way and eventually met CONLEY at the Kroger in Shepherdsville around 1:30 pm. Upon meeting CONLEY at the Kroger, she entered his vehicle. CONLEY advised that the previously mentioned photo shoot was a bondage scene. Additionally, CONLEY gave R.W. a red Yeti container, the same as from the previous meeting, and directed her to drink the contents. After drinking the contents, R.W. became very sleepy. CONLEY stopped and tied R.W.'s hands, feet, and mid-section explaining it

13

was for the bondage scene. CONLEY also gagged R.W. and put a hood over her head. R.W. then fell asleep for about two hours and when she woke up, she had no idea where she and CONLEY were located.

51. R.W. advised that shortly after getting into CONLEY's vehicle on 29 January 2019, he took her iPhone from her, saying he wanted to get some video's from it. R.W. gave CONLEY her password and never saw her iPhone again.

52. At some point on 29 January 2019, R.W. told CONLEY that she wanted to be cut loose and return home. CONLEY eventually cut R.W. loose but would not take her to her car or home saying that R.W. had been targeted by a sex trafficking ring and it was not safe for her to return that night. Eventually CONLEY parked the vehicle in a secluded parking lot and got into the back seat with R.W. where he pressured her into have sexual intercourse with him.

53. On 30 January 2019, CONLEY began driving again and R.W. told him she needed to return to her car to go to work. R.W. advised that CONLEY kept "blowing her off". All day on 30 January 2019, CONLEY did not stop to let R.W. get anything to eat and CONLEY told her that he had made plans for her to stay with him another night and that she still couldn't go home. Later CONLEY was arrested.

54. R.W. advised that she never would have had sexual intercourse with CONLEY if she knew he was lying about being a modeling agent or undercover cop.

55. At the conclusion of the interview, the FBI returned some of R.W.'s personal property which had been in CONLEY's Ford Taurus. R.W. advised that several of the items in her purse had been given to her by CONLEY. Those items were new sharpies, Pilot G2

14

ink pens, a 2019 calendar, a black portfolio, and a black business card holder. These items are seen in image "Office items given to R.W" in Attachment C.

### Search of Bryan Conley's Ford Taurus, VIN: 1FAHP2D89EG147917

56. The FBI executed a search warrant of CONLEY's Ford Taurus at the FBI Louisville Field Office. Search of the Ford Taurus revealed various items of evidentiary value as discussed below.

A. The FBI recovered, from the rear driver's side passenger seat and floor, a multicolored blanket and a green and black bungee cord with duct tape on it as seen in image "ERT_0036". These items matched the items seen in a proof of life photo sent to R.W's mother. The proof of life photo showed R.W. bound and laying on a car's seat during her kidnapping. The photo sent to R.W.'s mother is seen in image "IMG_0409" in Attachment C.

B. The FBI recovered, from the front passenger seat, a small sandwich bag with various gold jewelry inside as seen in image "ERT_0041" in Attachment C. These items matched items which were provided to CONLEY as part of the ransom demand placed inside a McDonalds bag. FBI agents, directing R.W.'s parents at the time of the kidnapping, took a photo of these items in the event that the image of the gold jewelry needed to be sent to CONLEY. A photo of these gold jewelry items from R.W. mother's phone is seen in image "thumb_IMG_2072" in Attachment C.

C. The FBI recovered, from under the front driver's seat, a black 1911 BB gun loaded with a magazine containing BBs, as seen in image "ERT_0038" in Attachment C.

15

D. The FBI recovered, from the front passenger seat, black zip ties, as seen in image "ERT_0043" in Attachment C.

E. The FBI recovered, from the front passenger seat, a purple bottle of NyQuil ZzzQuil and a 36 oz red Yeti container, as seen in image "ERT_0042" in Attachment C. This matches the description of the container that CONLEY gave to R.W. containing an unknown substance which after drinking, caused her be become extremely drowsy and eventually fall asleep.

F. The FBI recovered, from a back pack in the trunk, additional zip ties, a Trojan condom package, and a second black 1911 BB gun, as seen in image "ERT_0053" and "ERT_0055" in Attachment C.

G. The FBI recovered a Walmart receipt dated 1/28/2019 at 5:02 PM showing the purchase of rope, cable ties, tap measure, and spring binders from the location of 1680 Fort Campbell Blvd, Clarksville, TN. Legal process to Walmart confirmed this transaction and included still shots of CONLEY at the register purchasing these items. In CONLEY's hand appears to be the same rope that was used to bind R.W. as seen in image "IMG_0409" in Attachment C. The still shots can be seen in image "Still Shots" in Attachment C.

H. The FBI recovered a notebook which contained R.W.'s phone number, email address, and physical dimensions as seen in image "Conley car SW notebook" in Attachment C.

I. The FBI recovered a McDonalds bag, containing coffee creamers and other condiment items, which is believed to be the ransom bag that CONLEY retrieved

16

from the Tri-State International Trucks Inc. located at 200 J W Dickson Drive, Oak

Grove, KY on 1/30/2019.

J.   The FBI recovered various Walgreens receipts for Vanilla Visa cards valued at

$200.00 each.

K.   The FBI recovered a note from the trunk of CONLEY's vehicle.  The note stated

the following:

> Hello no cops
> Things you need
> Kalie + x husband + BBC 8+
> 10K – all $20.00
> Hotel
> Your phone # on your car
> Ill message soon
> Next time its your kids
> DP must nut
> In all holes 2x
> Each

### Interview of B. CONLEY's ex-wife K.C. on 19 February 2019

57.  On 19 February 2019 and 20 February 2019, affiant interviewed CONLEY's ex-wife,

K.C.  K.C. advised that she had been receiving threatening text messages from

unknown numbers since the spring of 2018.  Specifically one on 17 September 2018

which stated the following:

> Hi,
> You seem to never return
> my messages so further
> action will be taken
> So I know where you live
> Work
> Kids dr and school.
> You fucked my husband
> and think you can get
> away with it?

17

You have 30 day to get
ahold of your x and
answer immediately when
I text back
If not your family across
the street and kids will
pay for it.
No cops.
10k
A BBC
Camera
And hotel is what you will need

These text messages can be seen in images "Screenshot 20180917-171211 Messages"

and "Screenshot 20180917-171216 Messages"  See Attachment C.

58. K.C. advised that in the past, CONLEY has broken into her email account in order to

communication with her by sending emails to herself, which CONLEY knew would be

delivered on K.C.'s cell phone.  CONLEY has posed as her online and created various

online accounts in her name, such as on Facebook and MySpace, using photos of her

from when they were married.  K.C. advised that after they had become divorced, she

was cleaning out a vehicle they utilized and she found a thumb drive with file names

which included "rape" and other violent acts.  K.C. tried to provide the thumb drive to

the local police but they advised her to destroy it instead.

59. K.C. indicated that she had another disturbing experience with CONLEY shortly after

their divorce.  During a visitation session with the children, CONLEY brought K.C.

and the children food and drinks.  K.C.'s daughter attempted to take a drink of K.C.'s

beverage which CONLEY had brought her, and CONLEY disciplined the girl saying it

was K.C.'s drink, not the child's.  K.C. stated that during that session, CONLEY had

been acting strange.  Additionally, the drink CONLEY gave K.C. tasted "weird".  Later

18

that night, K.C. and her daughter started experiencing vaginal bleeding which caused K.C. to take the daughter to the children's hospital for testing.

### Correspondence with R.W. on 19 February 2019

60. On 19 February 2019, R.W. sent affiant an email advising that she had found some photos used for the Plenty of Fish "Lance" profile on the internet. Those images can been seen in "Lance from attachment1", "Lance from attachment2", and "Lance from attachment3" See Attachment C.

### Search of R.W.'s Apple iPhone A1864, S/N DX3XH0XEJCLP, 615-636-5512

61. The FBI conducted a search of R.W.'s Apple iPhone at the FBI Louisville Field Office. Search of the Apple iPhone revealed various items of evidentiary value as discussed below:

   A. The outgoing call log showed (4) calls to phone number 915-777-3617 which had been deleted between 1/28/2019 and 1/29/2019.

   B. Safari search terms on 1/26/2019 for "mcdonald's in dover tn", on 1/27/2019 for "debate jewelry", "des barres jewelry", "famous jewelry brands", and "famous".

   C. Images on the iPhone which show four pictures of a white male that R.W. identified on 19 February 2019 as being "Lance" from the Plenty of Fish "Lance" profile. Of note, two were marked for deletion on 1/29/2019 at 1:32:55 PM (UTC-6) and 1:32:58 PM (UTC-6).

   D. Image on the iPhone which shows R.W. bound and gagged which was marked for deletion on 1/29/2019 at 6:43:11 PM (UTC-6).

19

E.  Image on the iPhone which shows R.W.'s coworker, Missy Cox, which was marked

for deletion on 1/29/2019 at 6:43:11 PM (UTC-6).

F.  Images on the iPhone which show a nude buttocks and hands bound with tape

behind a person's back. [believed to be R.W.]

G.  Image on the iPhone which was sent to CONLEY, at FBI direction, to communicate

the ransom drop location at Tri-State International Trucks.

H.  Image on the iPhone which was sent to CONLEY, at FBI direction, of the ransom

drop bag, a McDonald's carry out bag placed at the edge of a paved surface and

grass.

I.  Two iMessage threads, one between R.W.'s phone and R.W.'s mother's phone and

another between R.W.'s phone and R.W.'s father's phone.  The discussion is

related to the kidnapping and paying of a ransom.  I should be noted that many of

the iMessages do not appear on R.W.'s phone and are suspected of being deleted by

CONLEY.

J.  One SMS thread between R.W.'s phone and R.W.'s mother's phone related to

paying the kidnapping ransom.


**Search of B. Conley's Samsung Galaxy S8+ SM-G955U, IMEI 355989084777502**

62. The FBI conducted a search of CONLEY's Samsung Galaxy at the Louisville Field

Office.  Search of the Samsung Galaxy revealed various items of evidentiary value as

discussed below:

20

A. Thousands of pornographic images and at least (2) images of child pornography. Affiant requested an FBI Special Agent who is an expert in violent crimes against children (VCAC) to review the (2) images of child pornography for confirmation.

B. Screenshots of text messages which include photos of a light skinned black male with his shirt unbuttoned and the text messages identifying himself as Eric De Beer and being number 1 in the diamond business. Additional photos inside the screenshots show close ups of a black male penis. On some screenshots an image of a Chase checking account (…4417) with Available Balance ($9,999,991.51) is included.

C. Images of the same white male whom R.W. identified as "Lance".

D. Hundreds of pornographic video clips.

E. An unsent text message to CONLEY's wife with the number "1008". This number is the passcode to R.W.'s iPhone.

F. A contact in CONLEY's phone identified as "Lance" using phone number 915-777-3617.

G. An active user account for TextMe, Inc. on CONLEY's phone with user name bhtown101b4414 and TextMe, Inc. phone number 213-630-0758.

H. TextMe chat sessions between R.W. and the TextMe, Inc. user name bhtown101b4414 in which R.W. identifies this user as "Lance". The user tells R.W. on 1/26/2019 at 11:18 PM that R.W. can contact CONLEY at phone number 915-777-3617 to meet at the McDonalds in Dover.

I. Four text messages between CONLEY and the "Lance" contact on 1/29/2019.

J. Photos of R.W. nude.

21

K.  Video of R.W. and CONLEY engaging in various forms of sexual intercourse.

L.  Video of a young black female, wearing pink under garments, dancing. This video
is dated 11/10/2018.

M.  A contact in CONLEY's phone identified as "Eric" using telephone number 915-
248-0746.

63. Legal processes was served on TextNow for the telephone number 915-777-3617.

TextNow provided records which contained two files related to phone number 915-

777-3617 and Username: loveiseasy2862. The information TextNow provided is as

follows: 1) Telephone number: 915-777-3617 is associated with email:

loveiseasy2862@gmail.com for the period of: 1/2/2019 02:09:41 UTC - 1/31/2019

04:59:59 UTC.


**Information provided by Special Agent Jim Burkett with the Texas Department of
Public Safety (DPS) – Criminal Investigative Division (CID)**

64. Special Agent (SA) Jim Burkett, DPS CID, Tyler contacted affiant and advised he was

investigating CONLEY for Human Trafficking of a 17-year-old juvenile. The

following information was provided by SA Jim Burkett:

65. On 14 November 2018, SA Burkett was contacted and advised that a possible Human

Trafficking victim was located at a juvenile facility in Grand Saline, Texas.

66. SA Burkett conducted an interview of the 17-year-old juvenile female, Victim #1, that

provided credible and reliable information that SA Burkett has corroborated. SA

Burkett learned that Victim # 1 lives in Pataskola, Ohio, and on approximately 8

November 2018, Victim # 1 went onto a dating website called "PlentyofFish.com"

22

(PoF).  Victim # 1 quickly made contact with an individual named "Bryant", who claimed to be a mixed race male in his 20's from Memphis, TN. "Bryant" utilized a profile name of "loveiseasy" with some numbers after it.

67.  After a while of texting on the PoF application, Victim # 1 began texting with "Bryant" through Victim # 1's cell phone. Victim # 1 stated that pictures later exchanged through text message showed "Bryant" to be tall and muscular, with caramel colored skin, and a tattoo on the left side of his chest.

68.  The conversation began as relationship talk, but once sexual activity was mentioned by "Bryant", the conversation turned into "Bryant" saying that "Bryant" would pay for different sex acts.  "Bryant" offered $200,000 for anal sex with Victim #1, and even more money if Victim # 1 brought a friend. "Bryant" also promised a new cellular telephone, a car, a new I.D., cash, etc. The conversation continued via cell phone through 9 November 2018.

On Saturday, 10 November 2018, "Bryant" claimed to have been in a vehicle accident, so "Bryant" sent a friend to pick Victim # 1 up and bring Victim # 1 to Tennessee for the weekend.

69.  Somewhere between 10:00 AM and 11:00 AM, a white male driving a grey Ford Taurus, arrived at a park near Victim # 1's house where Victim # 1 had been instructed to meet. Victim # 1 described the W/M as approximately 5'7" - 5'8", with a shaved head, approximately 200 pounds, and "fat". Victim # 1 described a tattoo on his arm/shoulder as having some type of red banner across it. SA Burkett later identified the white male as CONLEY.

70. Victim # 1 stated that while riding with "Bryant" from Ohio to Kentucky, Victim # 1 continued to text with "Bryant" who told Victim # 1 that "Bryant" would pay Victim # 1 even more money if Victim #1 had sex with CONLEY. Victim # 1 stated that CONLEY had also been texting while driving. SA Burkett advised that he believed based on his follow up investigation that the PoF profile for "Bryant" was likely CONLEY's.

71. CONLEY and Victim # 1 departed towards Tennessee and drove for a few hours and eventually stopped at a Super 8 hotel located at 1420 E Crystal Drive, LaGrange, KY. Upon arrival, CONLEY went inside and booked room # 210 and provided the name "BRYAN CONLEY" and telephone number 915-241-7423. Victim # 1 subsequently engaged in sex with CONLEY on 2 separate occasions in the hotel room.

72. On 11 November 2018 between 11:00 AM and 1:00 PM, CONLEY and Victim # 1 departed LaGrange, KY and began driving towards Tennessee.
At some point, Victim # 1 was texting with "Bryant". "Bryant" told Victim # 1 to get onto the PoF application and if Victim # 1 could find someone to have sex with her, and allow CONLEY to film it, "Bryant" would pay Victim # 1 more money. Victim # 1 was not sure of her exact location when that offer was made by "Bryant", but based on the driving time of approximately 5 hours to 6 hours, SA Burkett deduced the communication likely took place in the southern part of Kentucky.

73. Victim # 1 began trying to search in different geographic locations, but every male that replied declined except for one. SA Burkett later confirmed Victim #1's statements by later searching through the PoF messages with Victim # 1.

24

74. Eventually, a light skinned black male named "Ryan" agreed to have sex with Victim #1 while CONLEY filmed it. "Ryan" told Victim # 1 to go to Park Place Apartments in Jackson, TN. At this point, the two began texting on cell phones rather than over the Plenty of Fish application. Victim # 1 and "Ryan" exchanged nude photographs via cell phone. "Ryan" utilized the screen name of "RynoBSmoove96" on the Plenty of Fish application. At some point that afternoon/evening, Victim # 1 and CONLEY arrived at the apartments and met "Ryan", along with "Ryan's" brother. "Ryan's" brother then departed thereafter.

75. Victim # 1 and "Ryan" went into a bedroom and had oral, vaginal, and anal sex. CONLEY was in the room the entire time, and filmed Victim # 1 having sex with "Ryan", using his [CONLEY's] cell phone. After the sexual act was completed, CONLEY and Victim # 1 departed, and after another day, Victim #1 was abandoned in Texas without her cellular telephone.

76. SA Burkett conducted database searches and learned that CONLEY had been using telephone # 915-241-7423 as far back as 25 March 2018 and as recently as 30 January 2019.

77. There is probable cause to believe that CONLEY committed violations of 18 U.S.C. § 1591 (Sex trafficking of children by force, fraud, or coercion), 18 U.S.C. § 2423 (Transportation of minors), 18 U.S.C.A. § 2251 (Sexual Exploitation of Children), and 18 U.S.C.A. § 2252A(a)(5)(B) (Possession of Child Pornography).

78. It is believed that Conley's Samsung Galaxy S8+ SM-G955U, IMEI 355989084777502 may contain images of the victim. The United States intends to search for images of the minor victim Conley's phone and share the results with the Texas Department of

25

Public Safety. In addition, the FBI will search all digital information identified in

Attachment A for evidence of all crimes listed in paragraph 77.

### Probable Cause – Bank Fraud and Aggravated Identity Theft

79. During the course of R.W.'s kidnapping on 29 January 2019 and 30 January 2019, the

FBI sought financial records for R.W. which could identify her potential use of credit

cards or debit cards in order to locate where she had been prior to, and during the time,

that she had been kidnapped. Additionally, the FBI sought to identify any associates

she may have been with prior to the kidnapping. The FBI became aware that on 29

January 2019, shortly after midnight, R.W.'s Visa credit card, with number ████████

████ 2402, had been declined twice by her bank at the Walmart Supercenter located at

14800 Fort Campbell Blvd., Oak Grove, KY 42262.

80. Video files/clips provided by Walmart identified CONLEY as attempting to use R.W.'s

Visa credit card, with number ████████-2402, at the Walmart register during the

time in question. Walmart provided video of CONLEY at the register and they also

provided electronic records from the register for the attempted purchase, which

consisted of CONLEY attempting to purchase (2) Vanilla Prepaid Mastercard gift cards

for $200/each.

81. Walmart provided the below business records of the electronic transaction details:

```
ST# 03362 OP# 009044 TE# 44 TR# 07339
VMC 200 079936640140 206.88 0
VMC 200 079936640140 206.88 0
SUBTOTAL 413.76
TOTAL 413.76
```

```
************2402 I
EXPIRATION DATE 02/21
EMV TENDER DECLINED ONLINE
EMV TENDER DECLINED OFFLINE
CARD ISSUER DENIED THE CHARGE
VOIDED BANKCARD TRANSACTION
CAMT 000000041376
Visa Credit
AID A0000000031010
ICC 0840 en
TVR 0080008000 CVMR 5E0300 ARC 51
AAC E77259247BF69B10
IAD D45CA965CD3A60903531
ATC 0022 UP# 611270BF TSI F800
TERMINAL # SC010024
01/29/19 00:01:27
************2402 I
EXPIRATION DATE 02/21
EMV TENDER DECLINED ONLINE
EMV TENDER DECLINED OFFLINE
CARD ISSUER DENIED THE CHARGE
VOIDED BANKCARD TRANSACTION
CAMT 000000041376
Visa Credit
AID A0000000031010
ICC 0840 en
TVR 0080008000 CVMR 5E0300 ARC 05
AAC D08E6C0C4EE1EF0B
IAD 6DA254DA80C2BA223035
ATC 0023 UP# 34AA648A TSI F800
TERMINAL # SC010024
01/29/19 00:02:23
CSM 00006236 ASHLEY JON
CSM 00009052 SELF CHECKOUT MGR#52 2
===== CSM ABORT TRANSACTION ====
# VOIDS= 0 ** AMT VOIDS= 0.00
===== CSM APRROVED ABORT =====
******* TRANSACTION CANCELED *******
```

82. During interviews with R.W., the FBI became aware of R.W. leaving her purse and

backpack in CONLEY's vehicle on 28 January 2019.  Inside R.W.'s purse and

backpack were various personal identification documents and bank/credit cards. CONLEY admitting to attempting to use R.W. credit card, explaining that it was an accident, however it seems unlikely that CONLEY would mistake R.W.'s card for his own considering R.W.'s personal and credit/bank cards were inside her purse.

83. The FBI also became aware of an unauthorized attempt to log into R.W.'s bank account on 29 January 2019 at approximately 8:54 AM. The individual who attempted to log into R.W.'s bank account used an unregistered phone number of 915-241-7423. Bank records showed that R.W. regularly logged into her account profile via an iPhone. The bank reported that the correct social security number was provided but the authentication questions were answered incorrectly by the user of 915-241-7423.

84. As previously documented, subscriber records for 915-241-7423 returned to Cynthia Conley, CONLEY's wife. Additionally, when CONLEY was arrested on 30 January 2019 by the FBI, this phone was found inside his vehicle.

## COLLECTOR CHARACTERISTICS

85. Based upon Affiant's knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

a.     Child pornography collectors may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.    Collectors of child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Child pornography collectors oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.    Collectors of child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Child pornography collectors typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica,[1] and videotapes for many years.

d.    Likewise, collectors of child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly.

e.    Collectors of child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone

29

numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.    Collectors of child pornography prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

g.    Based on the information conveyed in the probable cause section of this affidavit, the Affiant believes CONLEY has a sexual interest in children and child pornography.

## Technical Terms

86. Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless

30

telephones may also include global positioning system ("GPS") technology for determining the location of the Devices.

b. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication device and can be used to access the Internet through cellular networks, "Wi-Fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

c. Hardrive: An external hardrive can serve as backup copy of the data stored on your hard drive in a computer or laptop. Accordingly, Seagate External Hard Drives can store documents, images, data, system backups, photos, and project files.

d. Thumbdrive: A thumb drive is a removable data storage Devices. Other common names for a flash drive include pendrive, thumb drive or simply USB. These devices have the ability to store a variety of digital files similar to those stored on a hard drive.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that

31

computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices are communicating with each other are in the same state.

87. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.samsung.com/global/galaxy/galaxy-s8/specs/, I know that the Samsung Galaxy S8+ with model number SM-G955U, utilizing telephone number 915-241-7423, and having the IMEI 355989084777502; has a digital camera and video recording capabilities. It has the ability to connect to the internet via cellular signal and Wi-Fi. It has Bluetooth technology that allows it to connect to other devices to share information. The black Huawei tablet model GB2-W09e has similar capabilities as the phone and can be used to connect to the internet, send and receive messages, connect via Bluetooth, take photographs and videos. It can also be used as a digital storage device. The Samsung Galaxy, a white Nema thumbdrive; a silver Seagate backup hard drive with serial number NA958ZHD; and a black Huawei tablet model GB2-W09e have capabilities that allow it to serve as digital media storage devices. In my training and experience, examining data stored on these devices of this type can uncover,

among other things, evidence that reveals or suggests who possessed or used the Devices. In addition, these devices can also provide location information.

### Electronic Storage and Forensic Analysis

88. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the devices. This information can sometimes be recovered with forensics tools.

89. There is probable cause to believe that things that were once stored on the devices may still be stored there, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In

addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

90. Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage

medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage Devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on the devices can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

35

  e. Further, in finding evidence of how devices were used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  f. I know that when an individual uses electronic devices to obtain unauthorized access to a victim electronic devices over the Internet, the individual's electronic devices will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic devices is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic devices is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic devices used to commit a crime of this type may contain: data that is evidence of how the electronic devices were used; data that was sent or received; and other records that indicate the nature of the offense.

91. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

92. Manner of execution. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises.  Consequently, I submit there is reasonable

cause for the Court to authorize execution of the warrant at any time in the day or night.

<u>Conclusion</u>

93. Based on the above information, affiant submits there is probable cause to believe that

CONLEY has committed the following offenses:

A. Interstate Threatening Communications - Title 18, United States Code, Sections 875(a) and (c);
B. Kidnapping - Title 18, United States Code, Section 1201;
C. Ransom Money - Title 18, United States Code. Section 1202;
D. Selling or Buying of Children – Title 18, United States Code, Section 2251A;
E. Bank Fraud - Title 18, United States Code, Section 1344; and
F. Aggravated Identity Theft - Title 18, United States Code, Section 1028A.
G. Sex Trafficking of Children by Force, Fraud, or Coercion—Title 18, United States Code, Section 1591(a)(1);
H. Transportation of Minors – Title 18, United States Code, Section 2423(a) and (e);
I. Sexual Exploitation of Children (Production of Child Pornography)—Title 18, United States Code, Section 2251(a); and
J. Possession of Child Pornography—Title 18, United States Code, Section 2252A(a)(5)(B).

94. CONLEY utilized a scheme where he created fraudulent dating profiles on the Plenty

of Fish application.  These profiles were designed by CONLEY to include stock

internet photos of attractive men as profile pictures.  Additionally, CONLEY developed

a notional backstory of being a single and wealthy man, typically involved in the

diamond business, looking for a relationship.  CONLEY did this in order to lure women

into conversations with him, which he eventually moved to face-to-face encounters.

CONLEY utilized this scheme with R.W. calling himself "Lance" and with Victim #1

calling himself "Bryant".  Both times he claimed to have a last name ending in

"Debeers" or "Debiers" and being famous as a rich individual involved in the diamond

business.

95. After arranging meetings with both R.W. and Victim #1, CONLEY used various excuses why Lance and Bryant could not meet R.W. or Victim #1. Those excuses included car accidents, or getting arrested, or being an undercover police officer. Then CONLEY, acting as Lance and/or Bryant, offered to send a "friend" who would actually meet R.W or Victim #1 on behalf of Lance and/or Bryant.

96. During CONLEY's time with R.W., he enticed her into believing he was a modeling agent and that he would take her to meet Lance on several occasions. Additionally, CONLEY lied to R.W. by telling her that she could make considerable amounts of money doing modeling sessions, to include sessions that were sexual. CONLEY provided bona fides to his story by taking R.W.'s personal and physical information for a modeling contract, texting cover text messages to himself from "Lance", and pretending to take photos and videos of R.W. for her modeling portfolio. CONLEY eventually kidnapped R.W. and made threating interstate communications to her mother and father, to include demands to pay a ransom for R.W.'s safe return.

97. During CONLEY's time with Victim #1, he enticed her into believing that "Bryant" would pay her enormous amounts of money to have sex with himself ["Bryant"], to have sex with CONLEY, and to travel across state lines to have sex with a Plenty of Fish user named "Ryan". CONLEY then produced a video record of the sexually explicit conduct between Victim #1 and "Ryan". CONLEY eventually left Victim #1 at a gas station in Texas with no resources, no cellular telephone, and no other means to return to her home in Ohio.

98. Investigation by affiant revealed that CONLEY attempted to defraud a bank through the unauthorized use of R.W. credit card for the attempted purchase of Vanilla cards.

Additionally, CONLEY attempted to log in to R.W.'s USAA online profile using her social security number and identity fraudulently.

99. I submit that further evidence relating to this criminal conduct will be found in CONLEY's cell phone, thumb drive, backup hard drive, and tablet. I therefore respectfully request that this Court issue a search warrant for the a SAMSUNG GALAXY S8+ SM-G955U, IMEI 355989084777502, WHITE NEMA THUMBDRIVE, SILVER SEAGATE BACKUP HARD DRIVE SN: NA958ZHD, and BLACK HUAWEI TABLET MODEL GB2-W09, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B.

100. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the devices described in Attachment A to seek the items described in Attachment B.


_____
Andrew Phillips
Special Agent
Federal Bureau of Investigation

Sworn to me and subscribed in my presence this __11__ Day of ~~May~~ June 2019.


_____
H. Brent Brennenstuhl
United States Magistrate Judge

Communicated by telephone
in accordance with
Fed.R.Crim. P.4.1 and 41.

39

## ATTACHMENT A

### DESCRIPTION OF PROPERTY TO BE SEARCHED

The property to be searched is a Samsung Galaxy S8+ with model number SM-G955U, utilizing telephone number 915-241-7423, and having the IMEI 355989084777502; a white Nema thumbdrive; a silver Seagate backup hard drive with serial number NA958ZHD; and a black Huawei tablet model GB2-W09, all currently located at FBI Headquarters, 12401 Sycamore Station Place, Louisville, KY 40299.

This warrant authorizes the forensic examination of these devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### LIST OF ITEMS TO BE SEIZED

1.      All records on the Devices described in Attachment A that relate to Bryan

Douglas Conley and involve violations of the following:

    a. Interstate Threatening Communications - Title 18, United States Code, Sections
       875(a) and (c);
    b. Kidnapping - Title 18, United States Code, Section 1201;
    c. Ransom Money - Title 18, United States Code. Section 1202;
    d. Selling or Buying of Children – Title 18, United States Code, Section 2251A;
    e. Bank Fraud - Title 18, United States Code, Section 1344; and
    f. Aggravated Identity Theft - Title 18, United States Code, Section 1028A.
    g. Sex Trafficking of Children by Force, Fraud, or Coercion—Title 18, United States
       Code, Section 1591(a)(1);
    h. Transportation of Minors – Title 18, United States Code, Section 2423(a) and (e);
    i. Sexual Exploitation of Children (Production of Child Pornography)—Title 18,
       United States Code, Section 2251(a); and
    j. Possession of Child Pornography—Title 18, United States Code, Section
       2252A(a)(5)(B).

2.      Including, but not limited to all, visual depictions, including still images, videos,

films or other recordings relating to interstate threatening communications or

extortion, kidnapping, ransom money and the events described in this warrant;

3.      any information recording CONLEY's communications with R.W. and

Victim#1;

4.      all messages to and from R.W. and Victim #1, including but not limited to; Short

Message Service (SMS), Multimedia Messaging Service (MMS), iMessages and

. messages to and from any application software;

5.      any information recording CONLEY's communications with "Lance" or

"Bryant";

6.   any information recording CONLEY's communications with M.W. and any family members of R.W.;

7.   Any and all documents, records emails, and internet history pertaining to interstate threatening communications.

8.   Evidence of user attribution showing who used or owned the cellular phone during the time period the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents and browsing history;

9.   Evidence of user location information;

10.   All records on the devices described in Attachment A that relate to violations of Sex Trafficking of Children by Force, Fraud, or Coercion—Title 18, United States Code, Section 1591(a)(1); Transportation of Minors – Title 18, United States Code, Section 2423(a) and (e); Sexual Exploitation of Children (Production of Child Pornography)—Title 18, United States Code, Section 2251(a); and Possession of Child Pornography—Title 18, United States Code, Section 2252A(a)(5)(B), and Selling or Buying of Children – Title 18 U.S.C. Section 2251A, including but not limited to:

   a.   Evidence related to production, transmission, possession, transfer, of images portraying minors in a sexual activity; and

   b.   Any communications (Chat logs, emails, instant messages, text messages, SMS messages) with others about the production, transmission, possession, transfer, of images portraying minors in a sexual activity.

11. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

12. Records evidencing the use of the Internet Protocol address to communicate with others about production, transmission, possession, transfer, of images portraying minors in a sexual activity, including:

   a.  records of Internet Protocol addresses used; and

   b.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

   c.  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

13.    All records on the devices described in Attachment A that relate to violations of Bank Fraud - Title 18 U.S.C. Section 1344; Aggravated Identity Theft - Title 18 U.S.C. Section 1028A including but not limited to:

   a.    Any and all images of bank records, receipts, bank statements, checks, deposit tickets and items, cashier's checks, money orders by whatever form, bank drafts or notes, traveler's checks, wire transfer records, cash disbursement journals or ledgers, cash receipts journals or ledgers, safe

deposit box records and keys, storage facility records and keys, insurance

records, records and receipts of expenditures of funds, tax returns, records or

documents related to income, expenses, assets, liabilities, and any other

documents recording or relating to the acquisition, conversion, movement,

secreting, transfer, and disbursement of currency and currency equivalents,

including any records identifying the source of the receipt and disposition of

such funds.

    b.    Any and all images of cashier's checks, traveler's checks, money orders,

bank drafts, credit cards, or financial documents and items.

    c.    Any and all images of documents, records, and objects relating to or

issued by the United States government of state governments which bear

identifying information.

    d.    Any and all means of identification, social security numbers, dates of

birth, access Devices numbers, credit card numbers and names of others.

    e.    Any and all financial information identifying Victim #1 or R.W.

3.    Records evidencing the use of the Internet Protocol address to communicate with, R.W.

or Victim #1, including:

a.    records of Internet Protocol addresses used;

b.    records of Internet activity, including firewall logs, caches, browser history and cookies,

"bookmarked" or "favorite" web pages, search terms that the user entered into any Internet

search engine, and records of user-typed web addresses.

    As used above, the terms "records" and "information" include all of the foregoing items

of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of Texas Department of Public Safety, and their support staff for their independent review.

ATTACHMENT C

IMAGES, PHOTOGRAPHS, AND FILES REFERENCED IN SEARCH AFFIDAVIT

1)   Office items given to R.W.



2)   ERT_0036



3)   IMG_0409



4)   ERT_0041



5)   Thumb_IMG_2072



6) ERT_0038



7) ERT_0043



8)   ERT_0042



9)   ERT_0053



10) ERT_0055



11) IMG_0409



12) Still Shots





13) Conley car SW notebook

██████████████

(415) 436 - 5513

rachelwalker@ outlook. com

rachlewd @ island. com

HT: 5 ft 2    X 2.5400 cm =

WT: 140    X 1.1536 kg   =

Hair: Brown(ed)

Eye: Brown

Cups: 34 DDD

length 1: 5'2    X 2.5400 cm:

length 2: 44    X 2.5400 cm:

Hips: m/s    X 2.5400 cm:

Dress: 3-10

Allergies: Tetals shot.

Percentage: 4%

Commission: 9%

Profession: All

Passport: Yes - check on status of update

14) Screenshot 20180917-171211 Messages

Screenshot 20180917-171216 Messages



< 4195045411

Hi.
You seem to never return my messages so further action will be taken

So I know where you live.
Work
Kids dr and school.
You fucked my husband and think you can get away with it?
You have 30 days to get ahold of your x and answer immediately when I text back.
If not your family across the street and kids will pay for it.
No cops.
10k
A BBC
Carnera
And hotel is what yo

VIEW ALL >

Good luck tramp I'll find u    1:04 PM

Enter message

‹   4195045411

Mon, Sep 17, 2018 1:04 PM

So I know where you live.
Work
Kids dr and school.
You fucked my husband and think you can
get away with it?
You have 30 days to get ahold of your x and
answer immediately when I text back.
If not your family across the street and
kids will pay for it.
No cops.
10k
A BBC
Camera
And hotel is what you will need.

15) Lance from attachment1

Lance from attachement2

Lance from attachment3





